IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

NAVAJO NATION,
*Plaintiff-Appellant*
v.

DEPARTMENT OF THE INTERIOR,
SALLY JEWELL, Secretary of the Interior, BUREAU OF RECLAMATION, and
BUREAU OF INDIAN AFFAIRS,
*Federal Defendants-Appellees*

STATE OF ARIZONA, CENTRAL ARIZONA WATER CONSERVATION
DISTRICT, ARIZONA POWER AUTHORITY, SALT RIVER PROJECT
AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, SALT RIVER
VALLEY WATER USERS' ASSOCIATION, IMPERIAL IRRIGATION DISTRICT,
METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA,
COACHELLA VALLEY WATER DISTRICT, STATE OF NEVADA, COLORADO
RIVER COMMISSION OF NEVADA, SOUTHERN NEVADA WATER
AUTHORITY and STATE OF COLORADO
*Intervenors-Defendants-Appellees*
_____

ON APPEAL FROM THE FEDERAL DISTRICT COURT FOR THE
DISTRICT OF ARIZONA, HON. MURRAY B. SNOW
_____

ANSWERING BRIEF FOR THE FEDERAL APPELLEES
_____

JOHN C. CRUDEN
Assistant Attorney General

Of Counsel:
ROBERT F. SNOW
SCOTT BERGSTROM
Office of the Solicitor
U.S. Department of the Interior
Washington, D.C. 20240

WILLIAM B. LAZARUS
ELLEN J. DURKEE
EDWARD S. GELDERMANN
ELIZABETH ANN PETERSON
Attorneys
U.S. Department of Justice
P.O. Box 7415
Washington, D.C.  20044
(202) 514-3888

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ............................................................ 1

INTRODUCTION ..................................................................................... 1

STATEMENT OF THE ISSUES ............................................................... 3

STATEMENT OF FACTS .......................................................................... 5

    A.    Historical Background ............................................................ 6

        1.    Background principles: the law of prior
             appropriation and Indian reserved water rights ........... 6

        2.    The Law of the River ...................................................... 9

             a.    The 1922 Compact ............................................... 10

             b.    The Boulder Canyon Project Act .......................... 11

             c.    The Arizona v. California decision and
                 decree (Supreme Court No. 8, Original) ............. 13

             d.    The Colorado River Project Act and the
                 Central Arizona Project ...................................... 16

    B.    The National Environmental Policy Act ("NEPA") ............. 17

    C.    Factual Background ............................................................. 19

        1.    The Interim Surplus Water Guidelines ....................... 20

        2.    The Shortage Guidelines .............................................. 22

PROCEDURAL BACKGROUND .......................................................... 25

SUMMARY OF ARGUMENT ..................................................... 27

STANDARD OF REVIEW ...................................................... 30

ARGUMENT ..................................................................... 31

I.    The district court correctly dismissed Navajo's
    NEPA claims ........................................................ 32

    A.    Navajo has not alleged facts sufficient to
        established standing to challenge alleged
        NEPA violations ............................................. 33

        1.    Navajo has not alleged injury-in-fact
            from alleged NEPA violations ........................... 34

            a.    Navajo does not allege concrete injury ...... 37

            b.    Navajo does not allege actual or
                imminent injury ......................................... 41

            c.    Navajo has not alleged injury
                "fairly traceable" to the implementation
                of the challenged guidelines ...................... 42

    B.    Navajo has not alleged injury-in-fact from the
        breach of a fiduciary duty ............................... 44

    C.    Navajo's claims are unripe ........................... 47

II.    Even if Navajo's claims are justiciable, they should
    be dismissed for lack of subject matter jurisdiction ............. 49

    A.    NEPA does not provide a cause of action for
        Navajo's claims ............................................. 49

    B.    The district court properly dismissed Navajo's
        breach-of-trust claim for lack of subject matter

jurisdiction ................................................................. 52

    1.    This case is controlled by this Court's precedent in *Gros Ventre Tribe v. United States*53

    2.    The district court reasonably harmonized this Court's conflicting precedents regarding the scope of the APA's waiver of sovereign immunity55

III.    The district court did not abuse its discretion in denying Navajo's post-judgment motion to amend its complaint ...... 57

    A.    The district court's decision may be reversed only for abuse of discretion ........................................... 57

    B.    The district court acted within its discretion in denying Navajo's post-judgment motion ...................... 59

CONCLUSION ......................................................................... 63

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**

*Allen v. Wright,*
   468 U.S. 737 (1984) ...................................................................... 48

*Arizona v. California,*
   344 U.S. 919 (1953) ...................................................................... 13

*Arizona v. California,*
   373 U.S. 546 (1963) ........................................... 5, 9, 10, 11, 14, 15

*Arizona v. California,*
   376 U.S. 340 (1964) ................................................................... 20-24

*Arizona v. California,*
   439 U.S. 419 (1979) (per curiam) ................................................ 16

*Arizona v. San Carlos Apache Tribe of Ariz.,*
   463 U.S. 545 (1983) ................................................................... 8, 38

*Ascon Props., Inc. v. Mobil Oil Co.,*
   866 F.2d 1149 (9th Cir. 1989) .................................................... 62

*Ashcroft v. Iqbal,*
   556 U.S. 652 (2009) ...................................................................... 31

*Atonio v. Wards Cove Packing Co.,*
   810 F.2d 1477 (9th Cir.1987) (en banc) (1988).............................. 58

*Bateman v. U.S. Postal Serv.,*
   231 F.3d 1220 (9th Cir. 2000) .................................................... 59

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ...................................................................... 31

*Bennett v. Spear,*

    520 U.S. 154 (1997) ....................................................... 48

*Bova v. City of Medford*,
    564 F.3d 1093 (9th Cir. 2009) ...................................... 40

*Browder v. Dir., Dep't of Corr. of Ill.*,
    434 U.S. 257 (1978) ....................................................... 59

*Cal. Or. Power Co. v. Beaver Portland Cement Co.*,
    295 U.S. 142 (1935) ........................................................ 7

*Cantrell v. City of Long Beach*,
    241 F.3d 674 (9th Cir. 2001) ....................................... 50

*Cappaert v. United States*,
    426 U.S. 128 (1976) ........................................................ 8

*City of Sausalito v. O'Neill*,
    386 F.3d 1186 (9th Cir. 2004) ...................................... 33

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) .................................... 31, 34, 40

*Claypool v. O'Neill*,
    133 P. 349 (Or. 1913) ..................................................... 7

*Colo. River Water Conserv. Dist. v. United States*,
    424 U.S. 800 (1976) ...................................................... 38

*Colorado v. New Mexico*,
    459 U.S. 176 (1982) ..................................................... 6, 7

*Colville Confederated Tribes v. Walton*,
    647 F.2d 42 (9th Cir. 1981) ........................................... 7

*Coons v. Lew*,
    762 F.3d 891 (9th Cir. 2014) ...................................... 48

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ............................................................ 31, 47

*Desert Irrigation, Ltd. v. State,*
    944 P.2d 835 (Nev. 1997) ............................................... 7

*Dixon v. Wallowa Cnty.,*
    336 F.3d 1013 (9th Cir. 2003) ..................................... 61

*FPC v. Niagara Mohawk Power Corp.,*
    347 U.S. 239 (1954) ......................................................... 6

*Flores-Figueroa v. United States,*
    556 U.S. 646 (2009) ....................................................... 31

*Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ....................................................... 35

*Gallo Cattle Co. v. USDA,*
    159 F.3d 1194 (9th Cir. 1998) ..................................... 56

*Gotelli v. Cardelli,*
    26 Nev. 382, 69 P. 8 (1902) ........................................... 7

*Gros Ventre Tribe v. United States,*
    469 F.3d 801 (9th Cir. 2006) ..................... 44, 45, 52, 54

*In re Syncor ERISA Litig.,*
    516 F.3d 1095 (9th Cir. 2008) ..................................... 61

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.,*
    88 F.3d 754 (9th Cir. 1996) ......................................... 18

*Janicki Logging Co. v. Mateer,*
    42 F.3d 561 (9th Cir. 1994) ......................................... 62

*Jicarilla Apache Tribe v. United States,*
    131 U.S. 2313 (2011) ..................................................... 44

*Kayes v. Pac. Lumber Co.*,
    51 F.3d 1449 (9th Cir.) ................................................... 58

*Klapprott v. United States*,
    335 U.S. 601 (1949) ...................................................... 58

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ...................................................... 30

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) (en banc) ......................... 18

*Lexmark International v. Static Control*,
    134 S.Ct.1377 (2014) ............................................... 49, 50

*Liljeberg v. Health Servs. Acq. Corp.*,
    486 U.S. 847 (1988) ...................................................... 59

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ........................................................ 34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................... 32-34, 40, 41

*Massachusetts v. EPA*,
    549 U.S. 497 (2011) ...................................................... 38

*Mayfield v. United States*,
    599 F.3d 964 (9th Cir. 2010) ....................................... 35

*Metro. Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983) ...................................................... 49

*Miccosukee Tribe of Indians v. United States*,
    980 F. Supp. 448 (S.D. Fla. 1997) .............................. 40

*Monsanto Co. v. Geertson Seed Farms*,

130 S. Ct. 2743 (2010) .................................................................. 32

*Morongo Band of Mission Indians v. FAA,*
    161 F.3d 569 (9th Cir. 1998) ........................................... 45

*Native Kivalina v. ExxonMobil Corp.,*
    696 F.3d 849 (9th Cir. 2012) ........................................... 30

*Nev. Land Action Ass'n v. U.S. Forest Serv.,*
    8 F.3d 713 (9th Cir. 1993) ............................................... 49

*Nuclear Info. & Res. Serv. v. NRC,*
    457 F.3d 941 (9th Cir. 2006) ........................................... 33

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) ...................................................... 48

*Okanogan Highlands Alliance v. Williams,*
    236 F.3d 468 (9th Cir. 2000) ........................................... 46

*Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang,*
    376 F.3d 831 (9th Cir. 2004) ........................................... 30

*Osborne v. Ohio,*
    495 U.S. 103 (1990) ...................................................... 33

*Owen Equip. & Erection Co. v. Kroger,*
    437 U.S. 365 (1978) ...................................................... 30

*Premo v. Martin,*
    19 F.3d 764 (9th Cir. 1997) ............................................. 62

*Presbyterian Church v. United States,*
    870 F.2d 518 (9th Cir. 1989) ........................................... 56

*Raines v. Byrd,*
    521 U.S. 811 (1997) ...................................................... 32

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) ...................................................... 18

*Ry. Mail Ass'n v. Corsi,*
326 U.S. 88 (1945) ........................................................ 32

*Seminole Nation v. United States,*
316 U.S. 286 (1942) ...................................................... 44

*Shoshone-Bannock Tribes v. Reno,*
56 F.3d 1476 (D.C. Cir. 1995) ...................................... 44

*Skokomish Indian Tribe v. FERC,*
121 F.3d 1303 (9th Cir. 1997) ..................................... 46

*Shoshone Indian Tribe of the Wind River Reservation v. United States,*
672 F.3d 1021 (Fed. Cir. 2012) ................................... 45

*Stock W., Inc. v. Confederated Tribes of Colville Reservation,*
873 F.2d 1221 (9th Cir. 1989) ..................................... 30

*Sturgeon v. Masica,*
768 F.3d 1066 (9th Cir. 2014) ............................... 34, 26

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ............................................... 33, 34

*Susan B. Anthony List v. Dreihaus,*
134 S. Ct. 2334 (2014) ................................................. 47

*Texas v. United States,*
523 U.S. 296 (1998) ...................................................... 40

*Thomas v. Anchorage Equal Rights Comm'n,*
220 F.3d 1134 (9th Cir. 2000) ................................ 32, 47

*United States v. Adair,*
723 F.2d 1394 (9th Cir. 1983) ....................................... 8

*United States v. Gen. Dynamics Corp.*,
   19 F.3d 770 (2d Cir. 1994) ............................................................ 62

*United States v. Mitchell (Mitchell II)*,
   463 U.S. 206 (1983) ...................................................................... 44

*United States v. Navajo Nation*,
   537 U.S. 488 (2003) ...................................................................... 45

*United States v. Ros*ales,
   19 F.3d 763 (9th Cir. 1994) ........................................................... 62

*United States v. Wash.*,
   98 F.3d 1159 (9th Cir. 1996) .......................................................... 59

*United States v. Winans*,
   198 U.S. 371 (1905) ........................................................................ 8

*Wash. Envtl. Council v. Bellon*,
   732 F.3d 1131 (9th Cir. 2013) ........................................... 30, 41, 42

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ...................................................................... 34

*Winter v. NRDC, Inc.*,
   129 S. Ct. 365 (2008) .................................................................... 17

*Winters v. United States*,
   207 U.S. 564 (1908) ..................................................................... 4, 7

*Wood v. Ryan*,
   759 F.3d 1117 (9th Cir. 2014) ........................................................ 60

*Wyoming v. Colorado*,
   259 U.S. 419 (1922) ...................................................................... 10

## STATUTES:

Administrative Procedure Act
    5 U.S.C. § 702 ............................................................. 52, 53, 54, 55
    5 U.S.C. § 704 ................................................................. 52, 53, 55
    5 U.S.C. § 706(2)(A)-(C) ............................................................. 25

Boulder Project Act
    43 U.S.C. § 617 *et seq.* ............................................................. 11

Colorado River Project Act
Pub. L. No. 90-537, 82 Stat. 885, 43 U.S.C. § 1501*et seq* ...................... 16
    43 U.S.C. § 1521 ............................................................. 16
    43 U.S.C. § 1552 ............................................................. 19
    43 U.S.C. § 1552(b) ......................................................... 16, 17

National Environmental Policy Act
    42 U.S.C. § 4331*et seq.* ............................................................. 17
    42 U.S.C. § 4331(b) ......................................................... 17
    42 U.S.C. § 4332 ............................................................. 17

The McCarran Amendment
    43 U.S.C. § 666 ............................................................. 38

42 Stat. 971 (1921) ............................................................. 10

28 U.S.C. § 1292(a)(1) ............................................................. 1
28 U.S.C. § 1331 ............................................................. 1
28 U.S.C. § 1362 ............................................................. 1

## RULES and REGULATIONS:

36 C.F.R. § 218.2 ............................................................. 19

40 C.F.R. § 1500.1(c) ............................................................. 18

40 C.F.R. § 1505.2 ............................................................. 19

40 C.F.R. § 1502.14 ............................................................... 18

40 C.F.R. § 1506.1 ................................................................. 19

43 C.F.R. pt. 414 ................................................................... 25

Fed. R. Civ. P. 12(b)(6) ................................................... 26, 30

Fed. R. Civ. P. 12(h)(3) ......................................................... 30

Fed. R. Civ. P. 15(a) .............................................................. 61

Fed. R. Civ. P. 15(a)(2) ......................................................... 57

Fed. R. Civ. P. 59(e) ...........................................................59-61

Fed. R. Civ. P. 60(b)(6) ...........................26, 29, 57-60, 62

Fed. R. Civ. P. 60(b)(6)(1)-(5) ............................................ 59

**LEGISLATIVE HISTORY:**

U.S. Const. art. III, § 2. ....................................................... 29

**MISCELLANEOUS:**

1 R. Clark, Waters and Water Rights (1967) ........................... 6

W. Hutchins, Selected Problems in the Law of Water Rights in the West
(U.S. Dept. of Agriculture, Misc. Pub. No. 418) (1942)................... 6

1 W. Hutchins, Water Rights Laws in the Nineteen Western States (U.S. Dept. of A

Charles Alan Wright & Arthur Miller, 6 Federal Practice and Procedure
§ 1489 (1990) ............................................................ 62

# STATEMENT OF JURISDICTION

Plaintiff Navajo Nation ("Navajo") asserted jurisdiction pursuant to 28 U.S.C. § 1331 and 1362. On July 22, 2014, the district court entered an order dismissing the complaint without prejudice for lack of subject matter jurisdiction. On October 1, 2014, the district court denied a motion for reconsideration. Appellants filed their notice of appeal on September 19, 2014, and an amended notice of appeal on October 10, 2014. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1).

# INTRODUCTION

In this case Navajo challenges the Secretary of the Interior's ("Secretary") compliance with the Administrative Procedure Act ("APA") and the procedural requirements of the National Environmental Policy Act ("NEPA") in taking a series of federal agency actions to implement the legal regime that governs the allocation and distribution of the waters of the Colorado River ("River") in the southwestern United States. The River, which provides a significant share of the water available for use in seven western states and parts of Mexico, is governed by a complex regime (commonly referred to as the "Law of the

River") under which the United States is responsible for allocating and distributing the water consistent with principles of federal and western water law (including federal reserved rights), as well as an array of interdependent legal requirements set out in interstate compacts, statutes, court decrees, agreements, contracts, and an international treaty. Navajo contends that the Secretary of the Interior ("Secretary") cannot lawfully manage the Colorado River absent a determination of the scope and quantity of rights Navajo may hold in the Lower Basin of the Colorado River.

Navajo's claims rest on the premise that the United States owes special fiduciary duties to Navajo arising from Navajo's beneficial ownership of the Navajo Reservation, that include a duty to quantify Navajo's water rights, including potential water rights in the River. Although Navajo's claims rest on NEPA and the APA, the relief Navajo seeks is the enforcement of purported trust duties unrelated to compliance with federal statutes. The district court rejected the premise underlying Navajo's claims as unfounded and dismissed the complaint.

# STATEMENT OF THE ISSUES

The Secretary, through the Bureau of Reclamation ("Bureau"), is charged with managing the mainstream waters of the Lower Basin of the River ("Lower Basin") in Nevada, California, and Arizona under a complex array of statutes, court decrees, and contractual agreements. The Navajo Reservation is located in part within the Lower Basin and includes unquantified reserved water rights, which may include rights in Lower Basin waters. In 2001, the Secretary, through the Bureau, published operational guidelines for reducing California's historical overuse of the River and managing surplus water in the Lower Basin. In 2007, the Secretary published revised guidelines for managing the operation of dams in both the Upper and Lower Basins of the River.[1] The 2007 guidelines revised the 2001 surplus guidelines and established guidance ("shortage guidelines") for reduced water releases under drought and low-reservoir conditions. The Bureau also published

---

[1] The challenged 2007 guidelines affect the operations of both Lake Powell, the reservoir created and managed by the Glen Canyon Dam in the Upper Basin of the River, and Lake Mead, the reservoir created and managed by the Hoover Dam, which is located in the Lower Basin. The guidelines accordingly affect the rights and obligations of all seven Colorado River Basin states under the Law of the River.

environmental impact statements (EISs) addressing the potential environmental consequences of implementing each of these management actions. Navajo seeks to invalidate the 2007 guidelines on grounds that the EISs do not adequately consider alleged impacts on Navajo's potential water rights and that they purportedly contain invalid statements regarding the Bureau's consideration of Indian reserved water rights. Navajo further alleges that the United States has breached a fiduciary duty to quantify Navajo's water rights under the doctrine established in *Winters v. United States,* 207 U.S. 564, 577 (1908). The issues are:

1. Is an allegation that the United States' management regime may lead to expectations on the part of competing Arizona water users, and that such expectations could later result in difficulty securing the use of water for the Navajo Reservation, sufficient to support Article III standing to challenge the Secretary's compliance with the National Environmental Policy Act in revising the regime to ensure predictable delivery of water to Colorado River water users?

2. Did the district court lack jurisdiction to hear an
   Administrative Procedure Act challenge premised on the
   United States' alleged breach of a fiduciary duty quantify
   Navajo's reserved water rights, including potential water rights
   in the Colorado River, where Navajo failed to identify any
   treaty, statute, or other source of substantive law establishing
   such a duty?

3. Did the district court abuse its discretion by denying Navajo's
   post-judgment motion for leave to revise its complaint?

## STATEMENT OF FACTS

Navajo challenges the Secretary's revision of guidelines for
implementing the Bureau's responsibilities under the Law of the River.
That legal regime evolved over the course of the twentieth century, as
the uses of Colorado River water increased, and interested states'
concerns over water scarcity threatened destabilizing conflict. See
generally, *Arizona v. California*, 373 U.S. 546 (1963). The Law of the
River has established an apportionment of water among the Lower
Basin states. The Secretary is charged, among other things, with
implementing the Law of the River through the operation of the system

of federal water storage and flood-control projects that has been constructed for the management of the River. The 2007 guidelines challenged here reflect the Secretary's efforts to enhance the efficiency of those operations, to encourage conservation and economical use of water, and to improve the predictability of delivery under existing water contracts.

A.    Historical Background

1.    *Background principles: the law of prior appropriation and Indian reserved water rights*

The "prior appropriation doctrine" governs the use of water in most of the western states. Under this system, water rights are acquired by diverting water and applying it to a beneficial purpose. A distinctive feature of the prior appropriation doctrine is the rule of priority, under which the relative rights of water users are ranked in the order of their seniority. *Colorado v. New Mexico*, 459 U.S. 176, 179 n.4 (1982) (citing 1 R. Clark, Waters and Water Rights (1967); W. Hutchins, *Selected Problems in the Law of Water Rights in the West* (U.S. Dept. of Agriculture, Misc. Pub. No. 418) (1942); 1 W. Hutchins, *Water Rights Laws in the Nineteen Western States* (U.S. Dept. of Agriculture, Misc. Pub. No. 1206) (1971)).

Water rights are usufructuary, not possessory, rights. See *Federal Power Comm'n v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 247 n. 10 (1954). Accordingly, under the law of prior appropriation, the owner of a water right merely holds a right to put water to beneficial use but has no ownership interest in the water itself. Owners of such rights therefore cannot appropriate more water than they need, and may not prevent others from using the water when it is not needed for the purposes of the appropriation. *Gotelli v. Cardelli*, 69 P. 8 (Nev. 1902); *Claypool v. O'Neill*, 133 P. 349, 351 (Ore. 1913). Appropriative rights ordinarily do not depend on land ownership and are acquired and maintained by actual use. *Colorado v. New Mexico*, 459 U.S. at 179. The failure to put appropriated water to beneficial use over extended periods of time may result in the loss of the water right through abandonment or forfeiture. *Desert Irrigation*, 944 P.2d at 842.

Against the backdrop of the prior appropriation doctrine, Congress severed rights in the use of water on federally-owned lands from other rights in the lands and subjected water rights to administration under state law. *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142 (1935). The Supreme Court has held that Congress

impliedly reserved unappropriated water sufficient to effectuate its purposes for use on lands reserved for specific federal purposes, such as Indian reservations. *Winters,* 207 U.S. at 577 (1908); see also, *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 46–47 (9th Cir.1981) (water rights reserved for specific reservation purposes identified through consideration of multiple factors, including document creating reservation, circumstances surrounding creation, history of tribe, and need of tribe to maintain itself under changed circumstances). This doctrine also applies in other circumstances, including when interpreting an executive order that created an Indian reservation. *Arizona v. California*, 373 at 597-98; *Cappaert v. United States*, 426 U.S. 128, 143-46 (1976), see also *United States v. Winans,* 198 U.S. 371 (1906) (treaty-reserved aboriginal rights); *United States v. Adair*, 723 F.2d 1394, 1414 (9th Cir.1983) (same). Unlike state-law claims based on prior appropriation, federal and Indian reserved water rights are not based on actual beneficial use and cannot be lost to forfeiture or abandonment for non-use. "Vested no later than the date each reservation was created, these Indian rights are superior in right to all

subsequent appropriations under state law." *Arizona v. San Carlos Apache Tribe of Arizona*, 463 U.S. 545, 574 (1983).

2.  *The Law of the River*

The Colorado River flows over about 1,300 miles through Colorado, Utah, and Arizona and along the Arizona-Nevada and Arizona-California boundaries, after which it passes into Mexico and empties into the Mexican waters of the Gulf of California. *Arizona v. California,* 373 U.S. at 552. It receives tributary waters from Wyoming, Colorado, Utah, Nevada, New Mexico, and Arizona, and drains an area of approximately 242,000 square miles—practically one-twelfth of the area of the continental United States excluding Alaska. *Ibid.* Much of this large basin is so arid that it is, and has always been, dependent upon managed use of the waters of the Colorado River System to make it productive and inhabitable. *Ibid.* The Secretary is charged with managing the River in accordance with an elaborate regime of interlocking requirements set out in interstate compacts, court decrees, statutes, agreements, contracts, and an international treaty. The guidelines challenged here were promulgated to assist in implementing

that management regime, relevant aspects of which are summarized below.

### a. The 1922 Compact

In the late nineteenth and early twentieth centuries, the "pressing necessity to transform the erratic and often destructive flow of the Colorado River into a controlled and dependable water supply desperately needed in so many States" (*id.* at 554), and the need for federal government assistance in achieving that transformation, became apparent. But because the prevailing water law in the western states was prior appropriation, see *Wyoming v. Colorado*, 259 U.S. 419 (1922), the prospect of federal investment in flood-control and storage works intensified concerns that the waters stored by federal projects would be "gobbled up in perpetuity by faster growing" downstream states (Arizona, Nevada, and California), before the upstream River states (Wyoming, Colorado, Utah, and New Mexico) could appropriate what they believed to be their fair share. *Arizona v. California*, 373 U.S. at 554.

The Basin states therefore requested, and on August 19, 1921, Congress passed, a statute giving the states consent to negotiate and

enter into a compact for the "equitable division and apportionment * * * of the water supply of the Colorado River." 42 Stat. 971 (1921). On November 24, 1922, the states completed the Colorado River Compact ("Compact"). See ER 153-57.

The Compact divided the River basin into two parts, the Upper and Lower Basins (ER 154, Art. II ¶¶ (f) & (g)) and apportioned 7,500,000 acre-feet of water per year ("afy") to each basin in perpetuity (ER 153, Art. III ¶ (a)). It also provided that "[p]resent perfected rights to the beneficial use of waters of the Colorado River System are unimpaired by this compact." *Id.* at Art. VIII (ER 156). Article VII of the Compact expressly provides that "[n]othing in this compact shall be construed as affecting the obligations of the United States of America to Indian reservations." *Id.* at Art. VI (ER 156).

### b. *The Boulder Canyon Project Act*

In 1928, Congress enacted the Boulder Canyon Project Act, 43 U.S.C. § 617 et seq. ("Boulder Project Act"), in which it conditionally approved the Compact–which had not yet been ratified–and authorized the Secretary of the Interior, "subject to the terms of the [C]ompact," to construct, operate, and maintain a dam in the mainstream of the River

at Black Canyon or Boulder Canyon, "adequate to create a storage reservoir of a capacity of not less than twenty million acre-feet of water." Boulder Project Act, § 1 (43 U.S.C. 617). This dam is known today as Hoover Dam.

The Boulder Project Act directs that water stored by the Project be used for "irrigation and domestic uses and satisfaction of present perfected rights recognized by the Compact." *Id.* at § 6.  Under sections 4(a) and 5 of the statute, water from the Project was to be made available by contract with the Secretary; and the three Lower Basin states (Arizona, California, and Nevada) were authorized to enter into an agreement apportioning 300,000 acre-feet per year ("afy") of mainstream Colorado River water to Nevada, 2.8 million acre-feet per year ("mafy") to Arizona, and 4.4 mafy to California. The Boulder Project Act provided that it would become effective upon the ratification of the Compact, either by all seven states or alternatively by only six states, provided that the California legislature assented by enactment to the statutory 4.4 mafy apportionment.  On March 4, 1929, the California Legislature adopted the "California Limitation Act," in which it "irrevocably and unconditionally" agreed to the 4.4 mafy limitation

(SER 1). The Boulder Project Act thus became fully effective on June 25, 1929, after six of the seven Basin States (excluding Arizona) ratified the Compact. The Secretary subsequently entered into contracts for delivery to the three Lower Basin states of water from the Project's reservoir (known as Lake Mead).

### c. The *Arizona* v. *California* decision and decree (Supreme Court No. 8, Original)

Disputes over Lower Basin water persisted, however. The states did not enter a three-state agreement regarding apportionment of the water, and in the 1930s, the Secretary contracted to deliver 5.3 mafy to California. Arizona sought federal assistance to construct a project that would allow the delivery of Colorado River water to Central Arizona, and California disputed Arizona's right to use River water for the proposed Central Arizona project. In 1953, the Supreme Court granted Arizona's motion for leave to file an original action seeking a decree confirming Arizona's right to the beneficial consumptive use of 3.8 mafy of mainstream Lower Colorado River water, and limiting California's entitlement to such water to 4.4 mafy. See *Arizona v. California*, 344 U.S. 919 (1953).

The Supreme Court concluded that the Boulder Project Act, and not the Compact or the doctrine of equitable apportionment, governs the division of mainstream water rights in the River among the Lower Basin states. It further held that in the Boulder Project Act, Congress established that a fair apportionment of the first 7,500,000 acre-feet of mainstream waters would allocate 2.8 mafy to Arizona and would limit California's share to 4.4 mafy. 373 U.S. 560, 564-65. It held that tributary waters would not be divided among the states, and would instead remain for exclusive use within each state. *Id.* at 567.

The United States intervened to assert reserved rights for various federal purposes, including the Navajo and other Indian reservations. In proceedings before a special master, the United States asserted *Winters* rights on behalf of 25 Indian reservations that drain into the Lower Colorado River and its tributaries. The United States presented evidence of 8,490 irrigable acres in the portion of the Navajo Reservation situated in the Lower Colorado River Basin, all within the drainage area of the Little Colorado River (SER 2).

The special master declined to reach many of the United States' claims, including the claims for reserved rights in the Little Colorado

River asserted for the Navajo Reservation. 373 U.S. at 595. The Supreme Court approved the Special Master's decision not to reach these claims. The Court held, however, that the United States has reserved mainstream water rights for five Indian reservations, effective when the reservations were created, and that those rights are "present perfected rights" entitled to priority under the Boulder Project Act. It further held that quantification of these *Winters* rights should be based on a "practically irrigable acreage" standard. *Id.* at 600-01. The Court did not approve the special master's decision to resolve boundary disputes affecting tribes whose reservations include mainstream water rights. It held that addressing these disputes was unnecessary, because "should a dispute over title arise because of some future refusal by the Secretary to deliver water to either area, the dispute can be settled at that time." *Id.* at 601.

The Court entered a decree ("1964 decree") that required the states and the Secretary to provide the Court with a list of present perfected rights to the use of the mainstream in each state within two years. It allowed the parties to apply to the Court for a determination of

such rights if the states and the United States could not agree as to the rights and their priority dates.

The United States applied for a determination of the "present perfected rights" of the five tribes whose *Winters* claims were confirmed in the 1964 decree. The parties then undertook negotiations to quantify and determine the priorities of water rights of all holders of "present perfected rights" in the Lower Basin; and the resulting stipulation of such rights was included in a supplemental decree entered in 1979. See *Arizona v. California*, 439 U.S. 419 (1979). The Court has since adjusted and supplemented the 1964 decree on several occasions to reflect the resolution of reservation boundary disputes and associated water rights, most recently in 2006. *Arizona v. California*, 547 U.S. 150 (2006). Article IX, which provides that the Court retains jurisdiction and may modify the decree as may be deemed proper at any time, remains unchanged in the decree.

### d. *The Colorado River Project Act and the Central Arizona Project*

Congress enacted the Colorado River Basin Project Act of 1968 ("Colorado River Project Act"), Pub. L. No. 90-537, 82 Stat. 885, 43 U.S.C. § 1501 *et seq.*, to address the operation of federal storage

reservoirs and dams in the Colorado River Basin. Among other things,

the Colorado River Project Act authorized construction and operation of

the Central Arizona Project. 43 U.S.C. § 1521. The Colorado River

Project Act additionally required the Secretary to adopt criteria for the

coordinated long-range operation of the reservoirs in the Basin, 43

U.S.C. §1552(b), and, beginning in 1972, to annually "transmit to the

Congress and to the Governors of the Colorado River Basin States a

report describing the actual operation under the adopted criteria for the

preceding compact water year and the projected operation for the

current year." *Id.*

B.    The National Environmental Policy Act ("NEPA")

Congress enacted the National Environmental Policy Act

("NEPA"), 42 U.S.C. § 4331, *et seq.*, to ensure that federal agencies fully

consider the environmental consequences of proposed actions. 42 U.S.C.

§ 4332. The procedural requirements set forth in NEPA are designed to

inform the decision-making of these agencies regarding potential

impacts of their proposed actions on the human environment. See, *e.g.*,

42 U.S.C. § 4331(b).

NEPA requires federal agencies "to the fullest extent possible" to prepare an Environmental Impact Statement ("EIS") for "every * * * major Federal action significantly affecting the quality of the human environment." *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 372 (2008). An EIS is a detailed analysis and study conducted to determine whether, or the extent to which, a proposed project will affect the environment. In accordance with regulations issued by the Council on Environmental Quality ("CEQ"), an EIS must disclose, to the extent possible, the direct, indirect, and cumulative impacts of the proposal, and must evaluate alternatives to the proposed action. 40 C.F.R. § 1502.14.

NEPA does not impose any substantive requirements on federal agencies—it "exists to ensure a process." *Inland Empire Pub. Lands Council v. United States Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996). NEPA aims to make certain that "'the agency * * * will have available, and will carefully consider, detailed information concerning significant environmental impacts,' and 'that the relevant information will be made available to the larger [public] audience.'" *Lands Council v. McNair*, 537 F.3d 981, 1000 (9th Cir. 2008) (*en banc*) (quoting *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 349 (1989)); see also 40 C.F.R. §

1500.1(c) ("The NEPA process is intended to help public officials make

decisions that are based on understanding of environmental

consequences, and take actions that protect, restore, and enhance the

environment."). After it completes the NEPA process, the agency

prepares a "Record of Decision" ("ROD"), which announces the agency's

final decision. The agency's issuance of a ROD documents both the

agency's completion of the environmental review process (see *e.g.*, 40

C.F.R. § 1505.2; 40 C.F.R. § 1506.1) and its substantive decision to take

action. See 36 C.F.R. § 218.2 (defining a ROD as a document "recording

a decision that was preceded by preparation of an environmental impact

statement").

### C.    Factual Background

In recent years, the Secretary has implemented a series of water

management actions to enhance the operations of Lower Colorado River

project facilities, and to enable the Lower Basin States to manage and

conserve water to which they are entitled under Boulder Project Act

contracts and the *Arizona v. California* Decree, with greater

predictability, efficiency, and economy.  At issue in this appeal are

interim surplus water guidelines published in 2001 and revised in 2007; and guidelines published in 2007 for management of the River under drought conditions.

### 1.   *The Interim Surplus Water Guidelines*

The 1964 *Arizona v. California* Decree provides that if enough water is available in a single year for pumping or release from Lake Mead to satisfy annual consumptive use in the states of California, Nevada and Arizona in excess of 7.5 million acre-feet (maf), that water may be determined by the Secretary to be available as "surplus" water, and apportioned such that 50% of the surplus is available for use in California, 46% for use in Arizona and 4% percent for use in Nevada. 376 U.S. at 342.

Under the Colorado River Project Act, 43 U.S.C.1552, the Secretary is required to adopt "Long-Range Operating Criteria" ("Operating Criteria") for determining whether the reasonable consumptive use requirements of mainstream users in Arizona, California and Nevada (the Lower Division states) can be met.  The Operating Criteria are utilized by the Secretary in establishing Annual Operating Plans ("AOP"), as required by the Colorado River Basin

Project Act, for the storage reservoirs in the Colorado River Basin for the upcoming year.

For many years, the Secretary relied on *ad hoc* consideration of factors in the Operating Criteria such as end-of-year system storage, potential runoff conditions, and projected water demands of the Basin States, in making decisions about the existence of surplus water supply conditions in the Lower Colorado River (SER 9). The year-to-year variation in the factors considered by the Secretary in making surplus water determinations made projections of surplus water availability highly uncertain  (SER 7).

The Secretary sought to lessen this uncertainty through the adoption of interim surplus criteria, which would enable the Bureau to afford mainstream users of Colorado River water (primarily in California) who routinely utilized surplus flows a greater degree of predictability with respect to the likely existence, or lack thereof, of surplus conditions on the river in a given year. *Id.* Based upon information submitted by the seven Colorado River Basin States, the Secretary developed, as the preferred alternative for NEPA purposes, the "Basin States Alternative," under which specified ranges of Lake

Mead water surface elevations would be used for determining the availability of surplus water, on an interim basis through 2016 (SER 11).

The Bureau evaluated the environmental impacts of the preferred alternative, and various other alternatives (including the "no action" alternative) in a draft environmental impact statement (EIS) issued in July 2000. After receiving comment on the draft EIS, the Bureau issued its final EIS ("FEIS") in December 2000 (see ER 277), in which it concluded that "the interim surplus criteria will not alter the quantity or priority of tribal entitlements." (See SER 26-27). On January 16, 2001, the Secretary issued a Record of Decision ("ROD") (ER 158) adopting Interim Surplus Guidelines, which were to apply from 2001 through 2016. Those guidelines were modified and extended in conjunction with the adoption of guidelines for management in years of water shortage, in 2007, as discussed below.

## 2. *The Shortage Guidelines*

With respect to shortages in water supply, the 1964 *Arizona v. California* Decree, 376 U.S. at 343, directs that, if the Secretary determines that insufficient mainstream water is available for release

to satisfy annual consumptive use of 7,500,000 acre feet in Arizona, California, and Nevada, the Secretary may apportion the amount that remains available for consumptive use consistent with the Boulder Project Act and applicable federal statutes. From 1999 to 2007, the Colorado River experienced the worst eight-year period of drought in over a century of continuous recordkeeping (SER 20). Water levels in Lake Powell (impounded by Glen Canyon Dam, upstream of Lee Ferry, Arizona) and Lake Mead (impounded by Hoover Dam) declined due to a combination of lower-than-average supply and increasing demand (SER 19)As of 2005, the Bureau had not yet developed operational rules for the full range of operations at Lake Powell and Lake Mead because such low-reservoir conditions had not previously occurred SER 18-19). In May 2005, Interior undertook to provide greater certainty to water users and managers in both the Upper and the Lower Basins as to when, and by how much, water deliveries will be reduced in drought and other low reservoir conditions by developing new operational guidelines and tools to address drought conditions and water shortages in the Colorado River Basin (SER 18).

In accordance with the requirements of NEPA, the Bureau developed the Preferred Alternative, which would determine shortage volumes based on water-level elevations in Lake Mead, and would coordinate the operations of Lake Powell and Lake Mead to minimize shortages in the Lower Basin and avoid the risk of curtailments in the Upper Basin (SER 23). The Preferred Alternative would also establish a mechanism to encourage and account for augmentation and conservation of water supplies in the Lower Basin, referred to as Intentionally Created Surplus, that would minimize the likelihood and severity of potential future shortages (SER 25) Finally, the Preferred Alternative would determine those conditions under which the Secretary may declare the availability of surplus water for use within the Lower Division states, and in so doing would extend and modify the substance of the existing Interim Surplus Guidelines from 2016 through 2026 (SER 19).

The Bureau published a draft EIS in February 2007. In the draft EIS, the Bureau analyzed the environmental impacts of six alternatives. Following a public comment period, the Bureau published its FEIS in November 2007 (See SER 15). With respect to individual

water rights, the FEIS stated that "[n]o vested water right of any kind, quantified or unquantified, including federally reserved Indian rights to Colorado River water * * * will be altered as a result of any of the alternatives under consideration" (ER 121). The Secretary signed the ROD for the 2007 guidelines in December 2007 (ER 280). The ROD adopted specific interim guidelines for managing Lower Basin shortages and coordinating operations of Lake Powell and Lake Mead, applicable to water supply and reservoir operating decisions through 2026. At the same time, the Secretary modified and extended the Interim Surplus Guidelines to apply from 2016 to 2026.

## PROCEDURAL BACKGROUND

On March 14, 2003, Navajo filed a Complaint for Declaratory and Injunctive Relief alleging that all of the Secretary's recent River management actions must be set aside as inconsistent with NEPA and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(2)(A) – (C), because the actions allegedly fail to account for and protect Navajo's potential water rights in the Colorado River. (ER 141-144; 2d Am. Comp. at ¶¶ 63–67, 69–71, 73-76, 82-84). Additionally, Navajo alleges that Interior's Interstate Water Banking Regulations, 43 C.F.R. Part

414, are unlawful, on the ground that they fail to account for Navajo's potential water rights in the River. The Complaint further alleges that the Secretary has a fiduciary duty to quantify Navajo's potential water rights in the mainstream of the River, and to take actions necessary to secure and deliver water as necessary for the reservation's purposes (ER 145).

Following a lengthy stay during which the parties unsuccessfully attempted to negotiate a settlement, Navajo amended its Complaint. The United States and numerous intervening parties moved to dismiss the amended complaint. Following the motions to dismiss, Navajo again amended the Complaint (ER 123). On July 22, 2014, the district court granted the United States' motion and dismissed the remaining motions as moot (ER 5). It held that Navajo had not alleged facts sufficient to establish federal court jurisdiction over its claims and dismissed the Complaint without prejudice. Following dismissal of the Complaint, Navajo filed a motion for relief from judgment under Rule 60(b)(6), seeking leave to amend its complaint. The district court denied that motion (ER 3).

## SUMMARY OF ARGUMENT

The district court correctly concluded that Navajo has not alleged facts sufficient to establish standing to challenge the Secretary's compliance with NEPA. Navajo's complaint alleges remote and speculative injury to an interest that is itself contingent and speculative, and therefore does not satisfy the prerequisites for "injury in fact." The requirement of injury-in-fact is a "hard floor of Article III jurisdiction that cannot be removed by statute," *Summers v. Earth Island Institute*, 555 U.S. 488, 497 (2009), and Navajo's complaint therefore fails to allege a justiciable controversy within the Article III jurisdiction of the federal courts.

The complaint's allegations of injury from the Secretary's alleged breach of a fiduciary duty suffers from the same defect. Fiduciary duties enforceable against the United States in federal court must be established by a treaty, statute, or other substantive source of law. Navajo's complaint failed to identify any such source of law establishing a duty to take affirmative steps to quantify Navajo's potential water rights in the River. Absent such a duty, Navajo's alleged injury is not

"fairly traceable" to a breach of fiduciary duty, and therefore fails to satisfy the requisites of injury-in-fact.

For many of the same reasons that the injury alleged here is not sufficient to establish standing, Navajo's claims fail to meet the criteria for ripeness. Navajo's complaint presents an abstract challenge "wholly contingent upon the occurrence of unforeseeable events." Its allegations therefore are insufficient to satisfy the constitutional prong of the ripeness doctrine under this Court's precedents.

Moreover, even if the claims are constitutionally justiciable, they must be dismissed in any event for failure to state a claim on which relief may be granted. Navajo alleges that the United States may have greater difficulty in securing any priority water rights Navajo may have in the Lower Colorado River because of third parties' reliance on delivery of surplus water under the guidelines. Navajo does not allege that the Bureau failed to consider any environmental impact on its interests in using the water, nor does it contend that harm to the environment from the guidelines will interfere with its interest in reserved water rights. The interests Navajo seeks to vindicate thus are

not within the "zone of interests" protected by NEPA, and its complaint must be dismissed for lack of subject matter jurisdiction.

The district court correctly dismissed Navajo's breach-of-trust claims for lack of subject matter jurisdiction. It held that the APA does not waive the United States' sovereign immunity from claims for common-law breach of trust, fully comports with this Court's precedents. Moreover, regardless whether the claim is barred by immunity, this Court's precedents dictate that no cause of action exists for breach-of-trust claims that are not based on specific statutory or other provisions of substantive law establishing the fiduciary duty allegedly breached. Because Navajo alleges a common-law breach of trust, its claims in this regard must be dismissed on the alternative ground of failure to state a claim on which relief may be granted.

Finally, the district court did not abuse its discretion in denying Navajo's Rule 60(b)(6) motion to amend its complaint. The court applied the standard of review applicable to motions filed under that provision and reasonably concluded that Navajo had not shown the required "extraordinary circumstances." The district court was well within its broad discretion under Rule 60 in concluding that Navajo was not

entitled to the liberal standard ordinarily applicable to motions to amend, because Navajo had provided no explanation for its failure to make a timely motion under the relevant rule, and had twice previously amended its complaint. The judgment of dismissal below therefore should be affirmed.

## STANDARD OF REVIEW

The jurisdiction of the federal courts is limited to "cases" and "controversies." U.S. Const. art. III, § 2. "If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). This Court reviews *de novo* the district court's assumption of jurisdiction. *Washington Environmental Council v. Bellon*, 732 F.3d 1131, 1138 (9th Cir. 2013).

"The existence of subject matter jurisdiction is a question of law reviewed de novo." *Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang*, 376 F.3d 831, 833 (9th Cir. 2004). "It is a fundamental principle that federal courts are courts of limited jurisdiction." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). Where jurisdiction is challenged pursuant to Rule 12(b)(1), "[a] federal court is presumed to lack jurisdiction in a particular case unless the contrary

affirmatively appears." *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989); see *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (non-moving party bears the burden to establish that subject matter jurisdiction exists).

This Court can affirm the district court's dismissal on any ground supported by the record, even if the district court did not expressly rely on it. See *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 652, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under *Iqbal*, a court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 556 U.S. at 679. If any well-pleaded allegations remain, the court will "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

# ARGUMENT

## I.  The district court correctly dismissed Navajo's NEPA claims

The district court here correctly concluded that Navajo failed to allege a justiciable "case or controversy" with respect its claims that the Secretary's actions violate the procedural requirements of NEPA. The Supreme Court recently reiterated that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l. USA*, 133 S. Ct. 1138, 1146 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). This Court thus has observed that "[t]he Courts' role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). Accordingly, "prior to the exercise of jurisdiction, the courts must determine that there exists a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or

abstract.'" *Thomas*, 220 F.3d at 1139 (quoting *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)).

To satisfy the requisites of a justiciable "case or controversy," plaintiffs "must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Lujan v. Defenders of Wildlife*, 504 U.S. at 560 (1992). Navajo has failed to do that here.

### A. Navajo has not alleged facts sufficient to establish standing to challenge alleged NEPA violations.

To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010); see *Lujan*, 504 U.S. at 564-65 n.2 (1992) (citing *Whitmore v. Arkansas*, 495 U.S. 148, 155 (1990)).

Moreover, "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496. Only a "person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy." *Ibid.* (quoting

*Lujan*, 504 U.S. at 572 n.7 (emphasis in original)). Thus, although where injury-in-fact is established, the requirements to show causation and redressability are relaxed somewhat for a party alleging that a federal agency has violated procedural law (see *Summers*, 555 U.S. at 1151; *Lujan*, 504 U.S. at 560), those requirements are not eliminated entirely. See *Nuclear Info & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 49 (9th Cir. 2006) ("We have recognized that our analysis of Article III standing is 'not fundamentally changed' by the fact that a petition asserts a 'procedural,' rather than a 'substantive' injury") (quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004)).

### 1. *Navajo has not alleged injury-in-fact from alleged NEPA violations*

Navajo alleges injury that is remote and speculative to an interest that is itself remote and speculative. Its allegations meet none of the prerequisites of injury-in-fact. The requirement of injury-in-fact is a "hard floor of Article III jurisdiction that cannot be removed by statute." *Summers*, 555 at 497. Accordingly, to state a justiciable claim, "the plaintiff must have suffered an 'injury in fact,' " which is both concrete and particularized, as well as actual or imminent. *Sturgeon v. Masica,*

768 F.3d 1066, 1071 (9th Cir. 2014) (quoting *Lujan,* 504 U.S. at 560). An allegation of future injury may suffice if the threatened injury is "certainly impending," or there is a "'substantial risk' that the harm will occur." *Clapper*, 133 S. Ct. at 1150, n. 5, 1161 (2013).

Where, as here, plaintiffs allege an injury dependent on the acts of others, the Supreme Court has required a "high degree of immediacy," to reduce the possibility of deciding a case in which no injury would have occurred at all. *Lujan,* 504 U.S. at 564 n.2, citing *Whitmore v. Arkansas*, 495 U.S. 149, 156–60; *Los Angeles v. Lyons*, 461 U.S. 95, 102-06 (1983). Neither "speculation [n]or 'subjective apprehension' about future harm support[s] standing." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) (quoting *Friends of the Earth v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 184 (2000)).

Navajo's complaint alleges that the Bureau violated NEPA by failing to give adequate consideration in its FEISs to the effect of the guidelines on Navajo's future ability to develop its potential water rights. Navajo asserts (Br. 19) that this alleged procedural injury is sufficient to invoke federal court jurisdiction over its NEPA claims. But Navajo's alleged injury is speculative and is not traceable to the

guidelines; and in any event NEPA does not accord Navajo a procedural right to protect the interests at stake here, because nothing in NEPA requires consideration of the "impacts" allegedly overlooked by the Bureau.

Navajo's complaint alleges (ER 25-26, ¶ 31) that "the allocation of water from the Colorado River without regard to the Navajo Nation's rights * * * establishes a system of reliance upon the Colorado River" by third parties, which "will operate to make allocation of Colorado River water to the Navajo Nation * * * increasingly difficult." *Ibid.* Navajo asserts (Br. 26) that the Bureau violated NEPA by failing to adequately consider whether the operation of the guidelines might "significantly reduce the supply of currently undeveloped water from the Colorado River for up to 50 years," and thereby "hinder Navajo's ability to develop its own surplus supplies in the future." It asserts that "it is reasonable to fear that [the guidelines] will limit the Navajo Nation's future options" in developing its *Winters* rights. The district court found that these allegations do not demonstrate the requisite connection between Navajo's alleged injury and the challenged guidelines to establish that it is "reasonably probable" that the

guidelines will threaten Navajo's interests. The district court correctly concluded (ER 14) that Navajo failed to allege facts sufficient to support standing.

### a. Navajo does not allege concrete injury.

A plaintiff possesses standing to enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Sturgeon v. Masica,* 786 F.3d at 1086 (quoting *Lujan*, 504 U.S. at 573 n. 8). Navajo does not allege that the Bureau failed to consider environmental harm – or direct impact of any kind – to Navajo's lands or resources from the guidelines. Instead, Navajo asserts (Br. 25) that the Bureau "ignore[d] political and practical realities," and speculates that the Bureau will not fulfill its commitment to "manage the Colorado River consistent with any tribal rights developed, established or quantified" while the guidelines are in effect. Navajo's fear regarding future competition for scarce water resources is entirely speculative and does not suffice to demonstrate the requisite injury-in-fact to establish standing.

To begin with, Navajo's claims are founded on the assumption that it has an as-yet unquantified interest in the mainstream of the Colorado River. Although the creation of the Reservation reserved water rights pursuant to *Winters,* Navajo concedes (Br. 9) that it does not have an adjudicated right to use mainstream waters. As discussed above, in the *Arizona v. California* litigation, the United States filed claims for water rights associated with the Navajo Reservation, but the Special Master declined to reach those claims. And as Navajo acknowledges (ER 123; Complaint ¶ 28), the United States has filed claims on behalf of Navajo in the Little Colorado River Adjudication, a comprehensive water rights adjudication currently proceeding in Arizona state court, and has assisted Navajo in securing rights in other waters, in New Mexico and Utah.[2] The water rights reserved for the Navajo Reservation therefore may be satisfied from sources other than

---

[2] The McCarran Amendment, 43 U.S.C. § 666, waived the sovereign immunity of the United States as to comprehensive state water-rights adjudications (see *Colorado River Conservation District v. United States*, 424 U.S. 800 (1976)), and provides state courts with jurisdiction in such adjudications to determine Indian water rights held in trust by the United States. *Id.; Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 567 n.17 (1983). The federal courts retain concurrent jurisdiction to adjudicate such rights but may not exercise it during the pendency of a comprehensive state adjudication. *Id.*

the mainstream Colorado River. Because it has not been determined that Navajo has water rights in the mainstream Lower Colorado River, it is speculative whether Navajo could be injured by actions to manage the mainstream.[3]

And even assuming Navajo were to establish rights in the mainstream River, its claimed injury based on as-yet unquantified rights is not sufficiently concrete to support standing. As the district court correctly observed, the guidelines do not regulate any of Navajo's activities. Nor do they impinge on its Reservation lands. Navajo alleges instead (ER 133; Complaint ¶ 31, 40, 45,) that the guidelines will "establish a system of reliance" by third parties on water from the mainstream for which Navajo might someday have a priority right. It

---

[3] Navajo's claim to the "special solicitude" owed to states (see *Massachusetts v. EPA*, 549 U.S. 497, 520 & n.17 (2011)) in this context is unavailing. Although Navajo has a sovereign interest in its Reservation and attendant water rights, it has no adjudicated right to divert water from the mainstream, regardless of the character of any right it might ultimately secure. The Supreme Court accorded "special solicitude" where the State submitted extensive scientific evidence that identified existing and threatened injuries to state interests, including the physical loss of state lands, to rising sea levels. *Massachusetts*, at 521-23. In contrast, Navajo does not allege that River management under the guidelines will have *any* direct effect on Navajo's lands or water rights.

asserts (see Br. 27) that this "reliance" may interfere with the United States' ability to secure water rights in the River for Navajo. But NEPA was not designed to protect Navajo's interest in securing the water rights that are the ultimate basis of its claim. NEPA instead provides procedural protection to assure consideration of environmental values in agency decision-making.

Moreover, Navajo's alleged injury is contingent on actions of third parties that would somehow interfere in the future with Navajo's exercise of its potential priority right to divert and use water. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all,' * * * because, if the contingent events do not occur, the plaintiff likely will not have suffered an injury that is concrete and particularized enough to establish the first element of standing." *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Because Navajo does not even allege any direct impact on its interests from the guidelines themselves, its allegations do not satisfy the requirement of concrete injury.

### b. *Navajo does not allege actual or imminent injury.*

The Supreme Court recently reiterated that "threatened injury must be certainly impending to constitute injury-in-fact, and [] allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013); see also, *Lujan*, 504 U.S. at 565, n.2 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes— that the injury is certainly impending"). Navajo's claim of future injury depends on multiple contingencies. It would have to be determined– while the guidelines remain in effect– that other sources are not sufficient to supply the Navajo Reservation's need for water. And implementation of the guidelines would have to cause water users other than Navajo to develop reliance that they otherwise would not have developed on the use of surplus water supplies. And even if both of these eventualities were to come to pass, no injury would occur unless those other users' reliance on surplus water supplies also caused harm to Navajo's ability to use the water in which it had established a priority right. It is possible that *none* of these events will occur. Such

possible future injuries are precisely what *Clapper* held insufficient to establish standing

### c. Navajo has not alleged injury "fairly traceable" to implementation of the challenged guidelines.

Nor does Navajo's complaint allege injury "fairly traceable" to the challenged action. "To satisfy the causality element for Article III standing, Plaintiffs must show that the injury is causally linked or "fairly traceable" to the Agencies' alleged misconduct, and not the result of misconduct of some third party not before the court." *Washington Environmental Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013) (citing *Lujan*, 504 U.S. at 560–61). Navajo asserts (Br. 26) that the Bureau incorrectly stated in the FEIS for the shortage guidelines that the impact from the guidelines would be favorable to tribal interests. It contends that instead, the guidelines will allow "harmful management practices" (Br. 26) to continue, because operations under the guidelines will allow "reliance" by third parties to develop (Br. 27).  In other words, Navajo contends that because the guidelines allow development of intentionally-created surplus supplies, third parties' reliance on surplus water supplies will increase, potentially interfering with Navajo's ability to develop any rights it may eventually secure in mainstream

water. It leaves to speculation, however, why that would be true. The Lower Basin has been fully utilizing its water supply from the mainstream for many years, and the guidelines were expressly adopted to *reduce* California's reliance on surplus water from the mainstream. There is accordingly no reason to conclude that the guidelines will cause Navajo to encounter greater difficulty in attempting at some future time to develop rights it may obtain in mainstream water.

And in any event, if and when Navajo can establish a *Winters* right in the mainstream, it can make beneficial use of water in the system for its Reservation as a senior water-right holder, regardless of whether that water has been developed or relied upon by third parties with junior priority dates. See FEIS at § 3.14 ("Tribes have the highest priority water rights in the Colorado River"). As a result, there is no reasonable probability that the guidelines will threaten Navajo's legally-protected interests in its Reservation and reserved water rights. Accordingly, as the district court correctly concluded, even if the Bureau had violated NEPA, Navajo has not alleged facts sufficient to establish standing to challenge the guidelines.

**B.    Navajo has not alleged injury-in-fact from the breach of a fiduciary duty.**

Pervading Navajo's allegations are assertions that the United States' trust relationship with the Navajo Nation requires that it "act affirmatively" to protect Navajo's trust resources (Complaint, ¶ 16); that it has a "duty to ensure that the Navajo Reservation lands have sufficient water" (*id.* ¶ 17A & C); and that the failure to take "all actions necessary" to protect these unquantified resources constitutes a breach of trust. (*id.* ¶ 19). As discussed above, Navajo therefore alleges that the Secretary cannot lawfully implement River management measures without first taking certain actions – including securing a quantification or other determination of its reserved water rights – to protect Navajo's potential right to use water from the River. It additionally alleges that such actions must be enjoined because they constitute a breach of the United States' purported fiduciary duties to Navajo.

Absent any treaty, statute, or other substantive source of law creating a trust duty to quantify Navajo's water rights, Navajo has not alleged injury "fairly traceable" to any breach of such a duty. The Courts have recognized a "distinctive obligation of trust incumbent

upon the Government in its dealings with [Indian tribes]." *United States v. Mitchell*, 463 U.S. 206, 225 (1983) (quoting *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942)). "That alone, however, does not impose a duty on the government to take action beyond complying with generally applicable statutes and regulations." *Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006) (citing *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C.Cir.1995)) ("[A]n Indian tribe cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty."); accord, *Jicarilla Apache Tribe v. United States,* 131 S. Ct. 2313, 2323 (2011) (though statutes denominate the relationship between the Government and the Indians a "trust," that trust is defined and governed by statutes rather than the common law); *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) ("[T]he analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions"); *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States,* 672 F.3d 1021, 1040 (Fed. Cir. 2012) ("when the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, neither the Government's

control over Indian assets nor common-law trust principles matter")
(internal quotation marks and citation omitted); *Miccosukee Tribe of
Indians of Fla. v. United States*, 980 F. Supp. 448, 461 (S.D.Fla.1997)
("[T]he government assumes no specific duties to Indian tribes beyond
those found in applicable statutes, regulations, treaties or other
agreements") (citing cases) *aff'd*, 163 F.3d 1359 (11th Cir.1998).

Thus, under this Court's precedents, "unless there is a specific
duty that has been placed on the government with respect to Indians,
[the government's general trust obligation] is discharged by [the
government's] compliance with general regulations and statutes not
specifically aimed at protecting Indian tribes." *Gros Ventre Tribe*, 469
F.3d at 810, quoting *Morongo Band of Mission Indians v. FAA*, 161 F.3d
569, 574 (9th Cir. 1998)); see also *Okanogan Highlands Alliance v.
Williams*, 236 F.3d 468, 479 (9th Cir. 2000), *Skokomish Indian Tribe v.
FERC*, 121 F.3d 1303, 1308–09 (9th Cir. 1997).

Navajo alleges that duties implied from the creation of its
Reservation require the United States to establish and quantify
Navajo's water rights in the Lower Colorado River. But the treaties and
Executive Orders that created the Reservation contain no mention of

any specific rights of the Navajo to the waters of the Lower Colorado. See 15 Stat. 667. As discussed above, the United States has filed claims and is participating as trustee for the benefit of the Navajo in the Little Colorado River general stream adjudication. But here, Navajo has identified no treaty, statute or other substantive source of law that requires the United States to quantify or otherwise determine Navajo's unadjudicated water rights in the Lower Colorado River. Absent any such express duty, Navajo cannot demonstrate the requisite injury-in-fact based on allegations that the Secretary has failed to undertake actions to quantify Navajo's potential water rights, or to secure or deliver water from the River to the Reservation.

## C.  Navajo's claims are unripe.

For many of the same reasons that Navajo lacks a sufficiently concrete, immediate stake in the implementation of the challenged guidelines to establish standing, Navajo's claims are not ripe. The doctrines of standing and ripeness originate from the same Article III limitation, see *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006), and in many cases – including this one – standing and ripeness "boil down to the same question." See, *e.g., Susan B. Anthony List v.*

*Dreihaus*, 134 S. Ct. 2334, 2341 n.5 (2014); see also, *Coons v. Lew*, 762 F.3d 891, (9th Cir. 2014) ("[R]ipeness can be characterized as 'standing on a timeline,' and the analysis for both standing and ripeness is essentially the same.") (quoting *Thomas*, 220 F.3d at 1138).

As discussed above, speculative allegations with respect to a potential future difficulty in securing water rights that is "wholly contingent upon the occurrence of unforeseeable events" are insufficient to satisfy the constitutional prong of the ripeness doctrine. *Coons,* 762 F.3d at 898 (quoting *Thomas*, 220 F.3d at 1141). Moreover, the challenged agency actions have no potential to cause direct injury to Navajo's *Winters*-based interests. Interior's guidelines neither permit nor forbid any action to allocate or use water contrary to Navajo's potential reserved water rights.

Navajo's appeal thus presents an abstract challenge to the agency's Lower Colorado River management regime that is not fit for judicial consideration. Navajo will suffer no hardship from withholding review, because absent a concrete action by the Secretary causing water to be allocated or used in a manner that interferes with Navajo's use of water reserved to it as a part of its Reservation, its interest in the

Secretary's regulatory regime has not been injured. See*, e.g., Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733 (1998). Navajo may challenge any concrete action that harms its interests if and when the Secretary takes such an action.

## II. Even if Navajo's claims are justiciable, they should be dismissed for lack of subject matter jurisdiction.

Even if Navajo can establish the requisites of a case or controversy, it still must show that a cause of action exists for its claims. A statutory cause of action is presumed to extend only to plaintiffs whose interests "fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751 (1984). "[T]he breadth of [that] zone * * * varies according to the provisions of law at issue." *Bennett v. Spear*, 520 U.S. 154, 163 (1997). Because Navajo has not alleged injury within the zone of interests protected by NEPA, no cause of action exists for its NEPA claims. And this Court has previously concluded that no cause of action exists to challenge an agency's alleged breach of common-law trust. Accordingly, dismissal of Navajo's remaining claim must be affirmed for lack of subject matter jurisdiction.

## A. NEPA does not provide a cause of action for Navajo's claims

A plaintiff who challenges agency action on the ground that it violates NEPA may not sue unless the interests he seeks to vindicate are within the "zone of interests" protected by NEPA. *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001). Accordingly, because NEPA was intended to protect the environment, the harm a NEPA plaintiff asserts must "have a sufficiently close connection to the physical environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 778 (1983). In contrast, "a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA." *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir.1993).

Navajo asserts (Br. 30) that the Supreme Court's recent decision in *Lexmark International v. Static Control,* 134 S.Ct. 1377 (2014), removed the "zone-of-interests" test from the standing inquiry and that this Court therefore need not address it. That reading of *Lexmark* is incorrect. At most, *Lexmark* stands for the proposition that a plaintiff with Article III standing nonetheless may not pursue its claims unless they fall within the zone of interests of the statute allegedly violated.

*Lexmark*, 134 U.S. at 1385 ("whether a plaintiff comes within the zone of interests requires the Court to determine, using traditional statutory-interpretation tools, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim"). In other words, even if Navajo had Article III standing, it could pursue only a challenge for which NEPA provides a cause of action.

Even assuming Navajo's complaint presents a justiciable case or controversy, therefore, its NEPA claims must be dismissed. Navajo seeks to protect a potential claim to an unquantified amount of water from the Lower Basin, and challenges the guidelines on the ground that they may exacerbate Navajo's difficulty in using its water right in the Lower Colorado River, if and when it is able to establish such a right. These unquantified and vague claims of interest do not have a sufficiently close connection to the physical environment to fall within NEPA's zone of interests.

Navajo challenges the guidelines on the ground that they were promulgated in violation of the procedural requirements of NEPA. But it does not allege that the Bureau failed to evaluate any environmental impact from implementation of the guidelines, or that management of

the River under them will adversely affect environmental values. Instead, Navajo alleges (ER 142-44; 2d Am. Comp. ¶¶ 66, 70, and 75) that the FEISs for the guidelines stated that "the United States examined all Indian water rights that could be affected by" the challenged guidelines, although "the Navajo Nation's Lower Basin Colorado River water rights were omitted and the unmet needs of the Navajo Nation and its members were not described." It further alleges (*id.* ¶ 83) that the Bureau's River management regime "allows entitlement holders other than the Navajo Nation to develop reliance upon the use of such waters which are claimed by, reserved for, needed by, and potentially belonging to the Navajo Nation." These interests do not have any connection to impacts on the physical environment, much less a sufficiently close connection to fall within NEPA's zone of interests. Accordingly, even if Navajo's complaint presented a justiciable challenge the guidelines under NEPA – and it does not – this Court must nonetheless affirm the district court's dismissal of Navajo's NEPA claims for lack of subject matter jurisdiction, because Navajo has failed to state a claim under NEPA.

**B. The district court properly dismissed Navajo's breach-of-trust claim for lack of subject matter jurisdiction.**

The district court dismissed Navajo's claim that the United States has breached fiduciary duties to assist the Navajo in securing a determination of its *Winters* right on the ground that the United States has not waived sovereign immunity to that claim (ER 15). Navajo challenges that conclusion (Br. 32) on the ground that the APA, 5 U.S.C § 702, waives the United States' immunity to all "claims with a cause of action grounded in statutes, treaties, the Constitution, or the common law, as well as claims premised on the APA." Regardless of whether section 702 waived the United States immunity here, however, the district court correctly dismissed Navajo's claim, which is indistinguishable from the claim addressed by this Court in *Gros Ventre Tribe v. United States*, 469 F.3d 801, 809-12 (2006).

Navajo asserts (Br. 33) that APA § 704, which defines "actions reviewable" as "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," is not a limitation on the waiver of sovereign immunity in APA § 702. It asserts that the district court therefore erred in dismissing the seventh count of its complaint, which seeks declaratory and injunctive relief

based on an alleged breach of a fiduciary duty. Navajo is incorrect. Binding precedent in this Court holds that the APA waives the United States' immunity from challenges to agency decision-making only where the "final agency action" requirement of § 704 is satisfied. And, although this Court has held that the waiver may apply to certain actions for nonmonetary relief based on improper agency action, it has never held that the waiver applies to claims for common-law breach of trust, as the district court correctly held.

1. *This case is controlled by this Court's precedent in Gros Ventre Tribe v. United States.*

Navajo asserts (Br. 34) that APA § 702 waives the United States' immunity from its claim based on the common law of trusts. Even if Navajo were correct (and it is not) that the APA waives immunity from its breach-of-trust claim, that claim nonetheless fails for lack of subject matter jurisdiction, as this court recently held in rejecting a claim indistinguishable from Navajo's claim in this case. In *Gros Ventre*, this Court held that the government's general trust obligations must be analyzed within the confines of generally applicable statutes and regulations. It concluded that it need not resolve the question whether the waiver of sovereign immunity in section 702 applied, because

"[t]ribes cannot allege a common law cause of action for breach of trust that is wholly separate from any statutorily granted right." *Gros Ventre Tribe v. United States,* 469 F.3d at 803. There is accordingly no cognizable federal-law claim for breach of trust to enforce duties that are not created by treaty, statute, or other substantive source of law. In other words, to state a claim for breach of trust, Navajo must allege that the Bureau has acted contrary to the requirements of a statute or other substantive source of law that creates the duty that the United States allegedly breached. Properly pled, therefore, its claim would be subject to the requirement of final agency action. Here, however, Navajo has not identified any source of law establishing either that it has specific rights to water from the River or that the United States has a duty to take specific actions regarding Navajo's potential, but unadjudicated, claims to the River. Accordingly, even if this Court were to conclude that Navajo's breach-of-trust claim is justiciable, it nonetheless must affirm the dismissal of that claim on the alternative ground of Navajo's failure to state a claim on which relief may be granted.

## 2. The district court reasonably harmonized this Court's conflicting precedents regarding the scope of the APA's waiver of sovereign immunity

Navajo contends (Br. 32) that this Circuit's precedents dictate that section 702 has eliminated the defense of sovereign immunity for all "claims with a cause of action grounded in statutes, treaties, the Constitution, or the common law, as well as claims premised on the APA." That assertion is incorrect. This Court need not reach the question whether Section 702 provides the requisite waiver of sovereign immunity because, as explained above, Navajo has failed to identify a statute or other source of substantive law that creates the duty allegedly breached. But even if this Court were to address the question, Navajo is incorrect that the APA provides the requisite waiver of sovereign immunity.

As this Court observed in *Gros Ventre,* binding precedent in this Court holds that the APA's waiver of sovereign immunity is limited by 5 U.S.C. § 704, which limits judicial review to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Gallo Cattle Co v. Department of Agric.,* 159 F.3d 1194, 1198 (9th Cir. 1998). But this Court has also held that

the waiver is effective where a plaintiff seeks to enforce a constitutional right and therefore is not dependent on the APA for a cause of action. *Presbyterian Church v. United States,* 870 F.2d 518, 525 (9th Cir. 1989). The district court's dismissal is consistent *Gallo Cattle,* and is not inconsistent with *Presbyterian Church,* and therefore must be affirmed.

The district court harmonized the two lines of authority, concluding that the APA waives the Unites States' sovereign immunity from certain constitutional claims as well as from claims challenging final agency action. And, although other courts have adopted the rule in *Presbyterian Church,* Navajo has cited no authority holding that § 702 waives the United States' immunity from common-law breach-of-trust claims. This Court therefore should affirm the district court's dismissal in this case.[4]

---

[4] In any event, this Court may not reverse on the grounds advanced by Navajo. In *Gros Ventre,* this Court concluded that the rulings in *Gallo Cattle* and *Presbyterian Church* cannot be distinguished. *Gros Ventre,* 469 F.3d at 807. A panel faced with such a conflict must call for *en banc* review, which the court will normally grant unless the prior decisions can be distinguished. *Atonio v. Wards Cove Packing Co.,* 810 F.2d 1477 (9th Cir.1987) (en banc) ("The appropriate mechanism for resolving an irreconcilable conflict is an *en banc* decision"). A panel of this Court thus is not empowered to reverse on the ground that § 702 waives the United States' immunity from a common-law breach-of-trust claim

## III. The district court did not abuse its discretion in denying Navajo's post-judgment motion to amend its complaint.

The district court denied Navajo's motion, filed under Rule 60(b)(6), for dismissal with leave to amend certain claims in its Second Amended Complaint. Navajo contends that the district court abused its discretion in denying the post-judgment motion, by applying the wrong standard and by failing to apply the permissive principles of Rule 15(a)(2), Fed.R.Civ.P. Navajo's arguments lack merit.

### A. The district court's decision may be reversed only for abuse of discretion.

Rule 60(b) provides that the court on motion may relieve a party or a party's legal representative from a final judgment, order, or proceeding on "such terms as are just" for any of five enumerated reasons, or "(6) [for] any other reason justifying relief from the operation of the judgment." A party may "not avail himself of the broad 'any other reason' clause of 60(b)" if his motion is based on grounds specified in clause (1) "mistake, inadvertence, surprise or excusable

---

under *Presbyterian Church,* but must instead call *sua sponte* for *en banc* consideration to resolve the intracircuit conflict between *Gallo Cattle* and *Presbyterian Church.*

neglect." Rather, "extraordinary circumstances" are required to bring the motion within the "other reason" language. *Klapprott v. United States,* 335 U.S. 601, 613 (1949).

This court reviews a district court's denial of a Rule 60(b) motion for an abuse of discretion. *Browder v. Director, Ill. Dept. of Corrections,* 434 U.S. 257, 263 n. 7 (1978); *Bateman v. U.S. Postal Serv.,* 231 F.3d 1220, 1223 (9th Cir. 2000). Under the abuse-of-discretion standard, a reviewing court may not reverse unless it has a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors. A district court may abuse its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact." *Kayes v. Pacific Lumber Co.,* 51 F.3d 1449, 1464 (9th Cir.) (quotations and citations omitted), cert. denied, 516 U.S. 914 (1995).

Rule 60(b)(6) relief should be used "sparingly as an equitable remedy to prevent manifest injustice." *United States v. Washington*, 98 F.3d 1159, 1163 (9th Cir. 1997). The rule cannot be used as a vehicle to relitigate matters already litigated and decided by the court. *Id.* The

district court here therefore reasonably denied Navajo's post-judgment motion for leave to amend its jurisdictional allegations.

## B. The district court acted within its discretion in denying Navajo's post-judgment motion.

Rule 60(b)(6) gives federal courts broad authority to grant relief from a final judgment "upon such terms as are just," provided that the motion is made within a reasonable time. *Liljeberg v. Health Serv. Acquisition Corp.* 486 U.S. 847, 863 (1988). Navajo points out (Br. 45) that it filed its Rule 60 motion within 28 days of final judgment and therefore could have filed a motion to alter or amend under Rule 59(e). It asserts that the district court therefore abused its discretion by applying the "extraordinary circumstances" standard for Rule 60(b)(6) relief. But even assuming the district court was free to consider Navajo's motion under Rule 59(e), it was not an abuse of discretion for the district court to apply the "extraordinary circumstances" standard that applies to motions filed under the rule Navajo invoked.

Rule 60(b)(6) permits reopening for "any * * * reason that justifies relief" other than the more specific reasons set out in Rule 60(b)(1)-(5). Fed. R. Civ. P. 60(b)(6). The party seeking relief under Rule 60(b)(6) must show " 'extraordinary circumstances' justifying the reopening of a

final judgment." *Wood v. Ryan,* 759 F.3d 1117, 1120 (9th Cir. 2014).

Navajo is incorrect that the "extraordinary circumstances" test applies only when a party seeks Rule 60(b) relief "because it waited too long to obtain relief under another subsection." Although the authorities on which Navajo relies show that Rule 60(b)(6) relief may be sought for claims that would otherwise be untimely requests for relief under other subsections of Rule 60, the rule grants the district court broad discretion to allow post-judgment relief for reasons other than those provided by the more specific subsections, subject to a showing of "extraordinary circumstances." Accordingly, the timing of Navajo's motion did not eliminate the requirement to demonstrate "extraordinary circumstances."

Nor was it an abuse of discretion to deny the motion. Even under the standard applicable to Rule 59(e), the district court properly denied the motion. That standard, as articulated by this Court, is that "amendments are appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *In re Syncor ERISA Litig.,* 516 F.3d 1095, 1100 (9th

Cir. 2008) (quoting *Dixon v. Wallowa County*, 336 F.3d 1013, 1022 (9th Cir. 2003)) (internal quotation marks omitted). None of these circumstances is present here, and the district court therefore did not abuse its discretion, even if the motion had been filed under Rule 59(e).

Nor is there any basis for Navajo's assertion that the district court should have applied the liberal standard for permission to amend a complaint found in Rule 15(a). In this case, the district court correctly concluded that Navajo's complaint did not allege facts sufficient to establish standing with respect to its NEPA claims and that federal court jurisdiction was lacking over its remaining claim as well. While Navajo did not provide any indication as to the content of its proposed third amended complaint, the district court reasonably could conclude that amendment would be futile. Rule 15(a) "is to be applied liberally in favor of amendment" and, in general, "'leave shall be freely given when justice so requires.'" *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir.1989) (quoting Fed.R.Civ.P. 15(a)). But the law of this Court is that "[l]eave need not be granted where the amendment of the complaint would cause the opposing party undue prejudice, is sought in bad faith, constitutes an exercise in futility, or creates undue

delay." *Janicki Logging v. Mateer,* 42 F.3d 561, 566 (9th Cir. 1994). And, despite Rule 15(a)'s admonition that leave to amend should be "freely given," post-judgment motions to amend are treated with greater skepticism than pre-judgment motions. *Premo v. Martin,* 19 F.3d 764, 772 (9th Cir. 1997) (citing Charles Alan Wright & Arthur Miller, 6 Federal Practice and Procedure § 1489 (1990)). Accordingly, after a judgment has been issued, the conclusion that amendment will cause undue delay is particularly justified. *Premo*, 19 F.3d at 772.

Amendment in these proceedings, where the district court has already concluded that the injury alleged is insufficiently related to the action challenged to provide a basis for federal court jurisdiction, is likely to cause undue delay; and denial of the motion to amend therefore was amply justified. See *Janicki*, 42 F.3d at 566. Navajo provided no explanation why it could not have made a timely Rule 15(a) motion, although it had twice previously amended its complaint since initiating the litigation in 2003. The district court therefore clearly did not abuse its discretion in denying Navajo's Rule 60(b) motion.

# CONCLUSION

For the foregoing reasons, the district court's judgment dismissing

Navajo's complaint should be affirmed.

Respectfully submitted,

JOHN C. CRUDEN
  *Assistant Attorney General*

*Of Counsel:*
ROBERT F. SNOW
SCOTT BERGSTROM
*Office of the Solicitor*
*U.S. Dept. of the Interior*
*Washington, D.C. 20240*

WILLIAM B. LAZARUS
ELLEN J. DURKEE
EDWARD J. GELDERMANN
ELIZABETH ANN PETERSON
*Attorneys,*
*Environment and Natural*
*Resources Division.*
*U.S. Department of Justice*
*P.O. Box 7415*
*Washington, D.C. 20044*
*(202) 514-3888*
*ann.peterson@usdoj.gov*

March 2015
90-1-2-10927

## STATEMENT OF RELATED CASES

Counsel is unaware of any related cases pending in this court.

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains __12,301 words__, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

Respectfully submitted,

_s/Elizabeth Ann Peterson_
**Attorney, Appellate Section**
**U.S. Department of Justice**
**Environment & Natural Res. Div.**
**P.O. Box 7415**
**Washington, D.C. 20044**
**(202) 514-3888**
**ann.peterson@usdoj.gov**

March 16, 2015

# CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2015, I electronically filed the foregoing Answering Brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in this appeal are registered CM/ECF users and will be served by the appellate CM/ECF system.

*s/Elizabeth Ann Peterson*